IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ERNIE JUNIOR PEREZ,

       Plaintiff,

                                    2:14-CV-380-PK

                                    OPINION AND ORDER

v.

COLETTE PETERS, MARK NOOTH, RANDY
GEER, MICHAEL CLEMENTS, KALLEE
EVANS, CHRIS SHUPE, J. DOE, and LORI
SCHULTZ,

       Defendants.

PAPAK, Magistrate Judge:

      Plaintiff *pro se* Ernie Junior Perez, an incarcerated prisoner, filed this action *in forma pauperis* against defendants Colette Peters, Mark Nooth, Randy Geer, Michael Clements, Kallee Evans, Chris Shupe, John or Jane Doe, and Lori Schultz on March 6, 2014. Perez amended his

Page 1 - OPINION AND ORDER

complaint effective July 31, 2014, and added Kelly Raths as an additional defendant effective

January 5, 2016. Perez amended his complaint a second time effective January 22, 2016.

By and through his second amended complaint, Perez alleges the defendants' liability

pursuant to 42 U.S.C. § 1983 for the violation of his free speech rights under the First

Amendment and, in a separately pled claim, under Section 1983 for the violation of his due

process rights under the Fourteenth Amendment. By and through his First Amendment claim,

Perez raises both facial and as-applied challenges to various specifically identified regulations

promulgated by the Oregon Department of Corrections ("ODOC"), challenges defendants'

conduct in rejecting certain mail and certain publications sent to him at the institution where he is

incarcerated, and challenges certain policies related to those rejections. By and through his

Fourteenth Amendment claim, Perez raises both facial and as-applied challenges to the adequacy

of the procedures made available to him for seeking administrative review of mail and

publication rejections, and in addition challenges the constitutionality of certain policies related

to those procedures. Perez seeks injunctive relief to prevent further such deprivations of rights

and prays for in excess of $540 in monetary damages.

Now before the court are Perez' motion (#151) for summary judgment, defendants' cross-

motion (#160) for summary judgment, and Perez' motion (#176) for imposition of sanctions

pursuant to Federal Civil Procedure Rule 11(b). I have considered the motions and all of the

pleadings and papers on file. For the reasons set forth below, Perez' motion (#151) for summary

judgment is granted in part as to his Fourteenth Amendment claim and otherwise denied in part

as discussed below, defendants' motion (#160) for summary judgment is denied in part as to

Perez' Fourteenth Amendment claim and otherwise granted as discussed below, and Perez'

motion (#176) for imposition of sanctions is denied in its entirety.

## LEGAL STANDARD

### I.    Cross-Motions for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party espousing the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense provides the metric for determining whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 150 (2000).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

## II.    Sanctions Pursuant to Federal Civil Procedure Rule 11(c)

Federal Civil Procedure Rule 11(c)(1) provides that the federal courts may impose appropriate sanctions on any attorney or party who, "after notice and an opportunity to respond," violates any of the provisions of Federal Civil Procedure Rule 11(b). Fed. R. Civ. P. 11(c)(1). A party moving for sanctions under Federal Civil Procedure Rule 11(c) must serve the motion on the party against whom sanctions are sought, and then may file the motion with the court any time following 21 days after service if the allegedly noncompliant filing is not withdrawn or otherwise appropriately corrected within that period. *See* Fed. R. Civ. P. 11(c)(2). Any sanction imposed pursuant to Rule 11(c) "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Attorney fees may be awarded as a sanction under Rule 11(c) "if imposed on motion and warranted for effective deterrence," but must be limited to the fees and other expenses "directly resulting from the violation." *Id.* Rule 11(b) provides as follows:

> By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge,

information, and belief, formed after an inquiry reasonable under the circumstances:

    (1)    it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

    (2)    the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

    (3)    the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

    (4)    the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

The courts have discretion to award a party prevailing on a Rule 11(c) motion its reasonable expenses, including attorney fees, incurred in connection with the motion, where such an award would be "warranted." Fed. R. Civ. P. 11(c)(2). The burden of establishing that sanctions are justified is borne by the party moving for imposition of sanctions. *See Tom Growney Equip. v. Shelley Irrigation Dev.*, 834 F.2d 833, 837 (9th Cir. 1987).

## MATERIAL FACTS

## I.    The Parties

Plaintiff Perez is, and at all material times was, an incarcerated prisoner of ODOC housed at the Snake River Correctional Institution ("SRCI"). Defendant Peters is, and at all material times was, the director of ODOC. Defendant Nooth is, and at all material times was, the superintendent of SRCI. Defendant Geer was at all material times until approximately March

2014 the central mail administrator at SRCI. Defendant Clements is, and at all material times was, a correctional lieutenant at SRCI charged with review of challenged institutional decisions to withhold mail from inmates. Defendant Schultz is, and at all material times was, a clerical employee at SRCI charged with responding to inmate kytes and with review of challenged institutional decisions to withhold publications from inmates. Defendant Evans is, and at all material times was, a clerical employee at SRCI charged with inspecting incoming inmate mail. Defendant Shupe is, and at all material times was, a clerical employee at SRCI charged with inspecting publications sent to inmates through the mail. Defendant Raths is ODOC's Administrator of the Office of Inmate and Community Services, and is responsible for maintaining the ODOC Publication Violation List (the "PVL") (discussed below).

## II.    The Parties' Dispute[1]

Perez' First Amendment claim arises out of defendants' conduct in rejecting his incoming mail on five occasions and in rejecting publications sent to him through the mail on three occasions, in promulgating and enforcing certain administrative regulations, and/or in failing to make the ODOC Publication Violation List readily available to him and to his correspondents. Perez' Fourteenth Amendment claim arises out of the administrative process he received in connection with his requests for administrative review of the eight rejections and/or out of defendants' purported failure to make the ODOC PVL readily available to him and to his correspondents.

---

[1] The following recitation constitutes my construal of the evidentiary record created by the parties, which is undisputed except as otherwise indicated below.

## A.    Rejected Mail and Related Administrative Process

On August 29, September 5, 10, and 17, and October 2, 2013, defendant Evans inspected

incoming mail to plaintiff Perez from his correspondent Jane Aston. *See* Second Amended

Complaint, Exh. 1. On each of those occasions, Evans rejected the mail on the grounds that it

contained "[s]exually explicit" content and that "[s]exually explicit material is prohibited." *See*

*id.* Also on each of those occasions, Evans sent Perez a "Mail Violation Notice" so advising him,

and additionally advising him that the rejected incoming mail was from Aston and that

independent administrative review of the rejection was available to him upon his written request

received by the Functional Unit Manager within 30 days of the date of the notice. *See id.* Each

of the Mail Violation Notices Evans prepared in connection with the rejections of August 29,

September 5, 10, and 17, and October 2, 2013, specifically indicated that administrative review

could be obtained "by writing to the Functional Unit Manager or designee at the above address,"

but nevertheless did not supply an address for the Functional Unit Manager or for any designee

thereof. *See id.* At some time after the complained-of events, SRCI modified its form Mail

Violation Notice to provide an address for the Functional Unit Manager, to clarify the description

of the procedure inmates are required to follow in order to obtain administrative review, to

describe the procedure available to persons sending mail to inmates for obtaining administrative

review of mail rejections, and to advise inmates and/or their correspondents of locations where

ODOC mail rules could be found and reviewed, among other changes. *See* Declaration (#162) of

Stephen Cook ("Cook Decl."), dated April 7, 2016, ¶¶ 23-26, *see also id.*, Exh. 13.

*In camera* review of the mail rejected on August 29, September 5, 10, and 17, and

October 2, 2013, establishes that each of the rejected letters (some of which were sent together

with photographs of clothed women, purportedly of Aston and/or her aunt; in one of the

photographs the undergarments of one of the women are visible) contained sexually explicit

content (*i.e.*, prose descriptions of masturbation, sexual arousal, and one instance of incestuous

sexual activity) as indicated by Evans in the five notices. *See id.*, Exhs. 3, 5, 7, 9, 11. Perez does

not dispute that each rejected piece of mail contained at least some sexually explicit content.

On August 30, 2013, Perez requested administrative view of the mail rejection of August

29, 2013, identifying the rejection at issue by date but not by notice number, and addressing his

request to Evans. *See* Second Amended Complaint, Exh. 2 at 1. On September 8, 2013,

defendant Schultz responded to Perez' request by directing him to identify the rejection by notice

number and to address the request with the notice number to defendant Clements. *See id.* That

same day, by and through two separate inmate communications forms, Perez requested

administrative review of the mail rejections of August 29 and September 5, 2013, identifying

each rejection by date and notice number and addressing each request to Clements as instructed

by Schultz. *See id.*, Exh. 2 at 3, 5. On September 19, 2013, Clements afforded Perez a brief

opportunity to review the mail rejected on August 29 and September 5, 2013, and Perez availed

himself of that opportunity. *See id.*, Exh. 3 at 5; *see also* Cook Decl., Exh. 12 at 1. On

September 20, 2013, Perez sent Clements a kyte stating as follows:

> You allowed me to review the rejected materials yesterday for [the rejections of
> August 29 and September 5, 2013]. [They] consisted of two black and white
> photocopies of photos and a letter. I didn't get a chance to look because it was so
> close to count time. I only caught glimpses of the materials.
>
> I don't think the rejected material was appropriately rejected because this material
> is not sexually violent or disturbing. I'm not a sex offender so it poses no threat to
> my rehabilitation. Sexually explicit material should not be rejected solely because
> it is sexually explicit.

Page 8 - OPINION AND ORDER

> Again, I didn't get a close look at the photos but the photos weren't even sexually
> explicit. It didn't look like her panties were see-through and if they were what I
> said above applies.

Second Amended Complaint, Exh. 3 at 1. On September 30, 2013, Clements affirmed that the

mail was in violation of O.A.R. 291-131-0035(1) (prohibiting inmates from receiving mail

containing sexually explicit content), upholding each of the two challenged rejections. *See* Cook

Decl. I, Exh. 12 at 1; *see also* Second Amended Complaint, Exh. 3 at 3.

On September 20, 2013, Perez requested administrative review of the mail rejections of

September 10 and 17, 2013, identifying each rejection by date and notice number and addressing

his requests to Clements. *See* Second Amended Complaint, Exh. 2 at 7, 9. On October 3, 2013,

Perez requested administrative review of the mail rejection of October 2, 2013, again identifying

the rejection by date and notice number and addressing his request to Clements. *See id.*, Exh. 2

at 11. Having heard nothing from SRCI staff regarding his outstanding requests, on October 7,

2013, Perez sent Clements a kyte to remind him that Perez' requests for administrative review

(including those discussed below in connection with the rejection of certain publications sent to

Perez) were still pending. *See id.*, Exh. 2 at 13. Perez' kyte of October 7, 2013, was returned to

him without response on October 10, 2013. *See id.*; *see also id.*, Exh. 2 at 15. On October 20,

2013, Perez sent Clements another kyte to the same effect as his kyte of October 7, 2013. *See id.*,

Exh. 2 at 15. On October 22, 2013, Schultz responded to Perez' kyte of October 20, 2013, stating

that "administrative reviews can take up to 45 days per rule" and indicating (with regard to the

publication rejections discussed below) that "[t]he publications that were violated [*sic*], mail

room is looking for the copies. When we get them, you will be scheduled." *Id.*

Also on October 22, 2013, Clements afforded Perez an opportunity to review the mail

rejected on September 10, September 17, and October 2, 2013, and Perez availed himself of that

opportunity. *See id.*, Exh. 3 at 4; *see also id.*, Exh. 3 at 5; Cook Decl., Exh. 12 at 2. That same

day, Perez sent Clements a kyte stating his grounds for believing that the rejections were

improper, as follows:

> Thank you for the administrative review for the mail violations [of September 10,
> September 17, and October 2, 2013]. I don't think the [rejec]tions should be
> upheld because [Anston] is an adult going to college and I'm an adult in prison;
> we're having a consensual, adult conversation.
>
> She recently wrote me a letter (I received it yesterday) stating that she is "terribly
> sad and depressed" and that she "will not write again after this short note." She
> said, "I hope they will permit you to have it so you know I do not stop for any
> reason that has to do with you or my affection for you."
>
> Please stop this extreme censorship policy.
>
> Please don't forget my publication violation admin review requests. Thank you.

Second Amended Complaint, Exh. 3 at 4. On October 30, 2013, Clements affirmed that the mail

was in violation of O.A.R. 291-131-0035(1), upholding each of the three challenged rejections.

*See* Cook Decl., Exh. 12 at 2.

### B.    Rejected Publications and Related Administrative Process

On September 6, 9, and 12, 2013, defendant Shupe inspected publications sent to Perez

through the mail (respectively, the three publications at issue were entitled *Girls on Top*, *Letters

to Penthouse XV*, and *Letters to Penthouse XII*). *See* Second Amended Complaint, Exh. 4 at 1-3.

On each of those occasions, Shupe sent Perez a "Publication Violation Notice" advising him that

the publication had been rejected. *See id.* Each of the Publication Violation Notices Shupe sent

to Perez identified the rejected publication by title and provided the name and the address of the

sender. *See id.* Like the Mail Violation Notices sent to Perez in connection with the

Page 10 - OPINION AND ORDER

complained-of mail rejections, each of the Publication Violation Notices Shupe sent to Perez stated that administrative review of the rejection could be obtained "by writing to the Functional Unit Manager or designee at the above address," but nevertheless did not supply an address for the Functional Unit Manager or for any designee thereof. *See id.* Moreover, none of the three Publication Violation Notices clearly identified the grounds for the rejection. *See id.* Instead, in the location on the form dedicated to setting forth the reason for the rejection, the Publication Violation Notices of September 6 and 12, 2013, displayed a checked box preceding text reading "1a,b,c pp. 12-13, 28-29, 178-183 Publication Violation," followed by further text (not preceded by either a checked or an empty checkbox) reading "*2. Contains material that threatens or is detrimental to the security, safety, health, good order, or discipline of the facility, inmate rehabilitation or facilitates criminal activity." *Id.* at 1, 3. On both notices, that text is followed by an additional paragraph reading as follows:

> **\*2**  **Material that Threatens or is Detrimental to the Security, Safety, Health, Good Order or Discipline of the Facility, Inmate Rehabilitation or Facilitates Criminal Activity** : Material which by its nature or content poses a threat or is detrimental to the Security, safety, health, good order, or discipline of the facility, inmate rehabilitation or facilitates criminal activity, including, but not limited to, material that meets one or more of the following criteria:
> a.  It incites, advocates, aids or abets criminal activity such as illegal drug use or instructs in the manufacture, used [*sic*] or conversion of weapons.
> b.  It incites, advocates, aids, or abets escape, such as picking locks or digging tunnels.
>
> c.  It consists of threats of physical harm to any person or threats of criminal activity.
> d.  It contains or concerns sending contraband within, into or out of the facility.
> e.  It concerns plans for activities in violation of other Department of Corrections administrative directives.

f.      It contains code that directly threatens or is detrimental to the
        security, safety, health, good order, or discipline of the facility,
        inmate rehabilitation, or facilitates criminal activity.
g.      It contains information which, if communicated, would create a
        clear and present danger of violence and physical harm to a human
        being.
h.      It contains contraband material.
i.      It contains security threat group (STG)-related paraphernalia.
j.      It contains inflammatory material.
k.      It contains role-playing or similar fantasy games or materials.

*Id.* The Publication Violation Notice of September 9, 2013, contains all of the same text in the

same location, other than the text reading "1a,b,c pp. 12-13, 28-29, 178-183" which does not

appear in any location on the form. *See id.* at 2.

        Notwithstanding the foregoing, defendants take the position that none of the three

publications was rejected because it constituted material that threatened or was detrimental to the

security, safety, health, good order, or discipline of the facility or to inmate rehabilitation or

because it constituted material with a tendency to facilitate criminal activity, and that all three

publications were instead rejected solely because they contained sexually explicit material.  In

support of that position, defendants rely in part on the text reading "1a,b,c pp. 12-13, 28-29,

178-183" that appeared on two of the three notices, which they argue corresponds to that

subsection of Oregon Administrative Rule 291-131-0035 (discussed below) that addresses

sexually explicit material.  Defendants further rely on copies of the three notices printed from

SRCI's electronic database of violation notices which, unlike the copies of the notices that Perez

actually received, clearly indicate that each of the three publications was rejected for containing

sexually explicit material.  *See* Cook Decl., Exh. 14.  Finally, defendants rely on the testimony of

a former SRCI lead mailroom worker that at some time after the complained-of events, SRCI

modified its form Publication Violation Notice to provide an address for the Functional Unit

Manager, to clarify the procedure inmates are required to follow in order to obtain administrative

review, and to provide a mechanism for communicating to inmates, where appropriate to do so,

that a publication was rejected because it contained sexually explicit material, *see id.*, ¶¶ 23-26,

and on that same worker's testimony that the database does not preserve copies of notices

actually issued to inmates, but rather modifies archived notices in accordance with any

subsequent updates effected to the form, *see id.*, ¶¶ 31-34.  Relying on the language appearing on

the notices he actually received, Perez characterizes defendants' position as baseless and as

fabricated for purposes of this litigation.

    *In camera* review of representative excerpts of the three publications establishes that each

rejected publication contained sexually explicit content (*i.e.*, prose descriptions of wildly

implausible sexual activity, in some instances nonconsensual sexual activity) but no other

content with any evident potential to threaten or impair inmate rehabilitation or institutional

security, safety, health, order, or discipline, and no content with any evident potential to facilitate

criminal activity.  *See id.*, Exhs. 17-19.  Perez does not dispute that each rejected publication

contained sexually explicit content, although he does dispute that the three publications were in

fact rejected for that reason.

    On September 25, 2013, by and through three separate kytes addressed to Clements,

Perez requested administrative view of the publication rejections of September 6, 9, and 12,

2013, identifying each rejection by date, notice number, sender, and publication title.  *See* Second

Amended Complaint, Exh. 4 at 4, 6, 8.  As discussed above in connection with the rejection of

certain mail addressed to Perez, having heard nothing from SRCI staff regarding his outstanding

Page 13 - OPINION AND ORDER

requests, on October 7, 2013, Perez sent Clements a kyte to remind him that Perez' requests for administrative review (including some of those discussed above in connection with the mail rejections) were still pending. *See id.*, Exh. 2 at 13. Also as discussed above, Perez' kyte of October 7, 2013, was returned to him without response on October 10, 2013. *See id.*; *see also id.*, Exh. 2 at 15. Also as discussed above, on October 20, 2013, Perez sent Clements another kyte to the same effect as his kyte of October 7, 2013. Also as discussed above, on October 22, 2013, Schultz responded to Perez' kyte of October 20, 2013, stating that "administrative reviews can take up to 45 days per rule" and indicating that "[t]he publications that were violated [*sic*], mail room is looking for the copies. When we get them, you will be scheduled." *Id.*

On October 30, 2013, Schultz advised Perez through three separate kytes that the SRCI mail room had failed to keep copies on file of any photocopied portions of any of the three rejected publications, variously characterizing the failure as "accident[]" and as "error." *See id.*, Exh. 4 at 4, 6, 8. Schultz suggested that Perez re-order the materials, impliedly at his own expense, so that they might be rejected again (if rejection was appropriate) and properly scanned for purposes of facilitating administrative review. *See id.* Defendants offer the declaration testimony of the former lead worker in SRCI's Mail Processing Center, that the failure to keep photocopies of any portion of the three rejected publications was "not pursuant to any written or unwritten custom, and was human error." Cook Decl., ¶ 55. Perez received no further administrative process in connection with any of the three publication rejections.

### C.     The ODOC Publication Violation List

ODOC maintains a list of all publications rejected within the previous three years. *See* Cook Decl., ¶ 45. ODOC's Publication Violations List is stored on a hard drive accessible by

Page 14 - OPINION AND ORDER

SRCI mailroom staff. *See id.* When an ODOC institution receives a publication already appearing on the PVL, it rejects that publication summarily, on the ground that its rejection has already been determined to be appropriate. *See id.*, ¶¶ 50-51.

At the time Perez was sent *Girls on Top* and *Letters to Penthouse XII*, those publications were already on the PVL. *See id.*, ¶¶ 47-48.

At some time in September 2015 – after the complained-of rejections had already been effected and after Perez sought and either obtained or was denied administrative review in connection with those rejections – SRCI made a version of the PVL available for inmates to review. *See id.*, ¶ 52. In October 2015, SRCI made a newsletter available to inmates that indicated that inmates could kyte queries to the SRCI Mail Processing Center as to whether specific publications appeared on the PVL. *See id.*, ¶ 53. The PVL was not made available to Perez for his review at any material time, and indeed he did not learn of its existence until after he initiated these proceedings. *See* Docket No. 104. It does not appear that the PVL is affirmatively made readily available to the public or for inspection by persons proposing to send publications to inmates, except insofar as all public records in Oregon are subject to requests for inspection under Or. Rev. Stat. § 192.440(1).

## III.    Relevant ODOC Regulations

Division 131 of the Oregon Administrative Rules, promulgated by ODOC, governs the sending, receipt and processing of inmate mail in ODOC facilities. *See* O.A.R. 291-131-0005(2). Pursuant to O.A.R. 291-131-015(2), ODOC inmates are prohibited from sending, receiving, transferring, or possessing mail which violates the provisions of the rules set forth in Division 131. *See* O.A.R. 291-131-0015(2).

ODOC regulations governing incoming inmate mail are codified at O.A.R. 291-131-0025

and 291-131-0035. In relevant part, Rule 291-131-0025 provides that:

> (5)  New and used books, magazines, and newspapers shall only be received
>      directly from the publisher or distributor.
>
>      * * *
>
>      (b)  Publications that have been previously rejected by the department
>           and altered (*i.e.*, offending pages removed) shall be prohibited.
>
> * * *
>
> (11)  Unauthorized Attachments and Enclosures:
>
>      * * *
>
>      (b)  Only written correspondence, newspaper and magazine clippings,
>           small pamphlets, photocopies, carbon copies, business cards, hand
>           made drawings, printed web pages, and photographs that meet the
>           content restrictions in these rules may be enclosed in the envelope.
>
>           * * *
>
>           (D)  Freestanding Nude or Partially Nude Images:  Newspaper
>                and magazine clippings, photocopies, printed web pages,
>                drawings, photographs, and other media with nude or
>                partially nude subjects, whether human or anime (*i.e.*,
>                cartoon), that depict or display male or female genitalia,
>                pubic area or anus, or expose the female areola, may not be
>                attached to or enclosed in correspondence to inmates.

O.A.R. 291-131-0025(5), (11).  By and through his First Amendment claim, Perez challenges

(*inter alia*) the facial constitutionality of Rule 291-131-0025(11)(b)(D).

In relevant part, Rule 291-131-0035 provides as follows:

> The following materials constitute prohibited mail which shall be confiscated or
> returned to the sender:
>
> (1)  Sexually Explicit Material:

Page 16 - OPINION AND ORDER

(a)     Sexually explicit material which by its nature or content poses a threat or is detrimental to the security, good order or discipline of the facility, inmate rehabilitation, or facilitates criminal activity including, but not limited to, the following:

    (A)     Sexual Acts or Behaviors:

        (i)      Portrayal of actual or simulated sexual acts or behaviors between human beings including, but not limited to, intercourse, sodomy, fellatio, cunnilingus or masturbation.

        (ii)     Portrayal of actual or simulated penetration of the vagina or anus, or contact between the mouth and the breast, genitals, or anus.

        (iii)    Portrayal of actual or simulated stimulation of the breast, genitals, or anus.

        (iv)    Portrayal of actual or simulated acts or threatened acts of force or violence in a sexual context, including, but not limited to, forcible intercourse (rape) or acts of sadomasochism emphasizing the infliction of pain.

        (v)     Portrayal of actual or simulated sexual acts or behaviors in which one of the participants is a minor, or appears to be under the age of 18.

        (vi)    Bestiality:  Portrayal of actual or simulated sexual acts or behaviors between a human being and an animal.

    (B)     Excretory Functions:  Portrayal of actual or simulated human excretory functions, including, but not limited to, urination, defecation, or ejaculation.

    (C)     Personal photographs in which the subject is nude; displays male or female genitalia, pubic area, or

anus; or exposes the areola.

        (D)     Freestanding Nude or Partially Nude Images: Newspaper and magazine clippings, photocopies, printed web pages, drawings contained in incoming mail, and photographs, with nude or partially nude subjects, whether human or anime (i.e., cartoon), that depict or display male or female genitalia, pubic area or anus, or expose the female areola.

    \* \* \*

(e)     Sexually explicit material may be admitted if it has scholarly value, or general social or literary value.

(2)     Material That Threatens or is Detrimental to the Security, Safety, Health, Good Order or Discipline of the Facility, Inmate Rehabilitation, or Facilitates Criminal Activity: Material which by its nature or content poses a threat or is detrimental to the security, safety, health, good order or discipline of the facility, inmate rehabilitation, or facilitates criminal activity, including, but not limited to, material that meets one or more of the following criteria:

    \* \* \*

(d)     It contains or concerns sending contraband within, into or out of the facility.

    \* \* \*

(h)     It contains contraband material.

    \* \* \*

(j)     It contains inflammatory material.

    \* \* \*

\* \* \*

(7)     Any other material that the department deems to pose a threat or to be detrimental to legitimate penological objectives.

O.A.R. 291-131-0035(1), (2), (7).  For purposes of Rule 291-131-0035, "portrayal" is defined as "[t]he act or process by which an idea or message is depicted or represented, usually by written words or images," O.A.R. 291-131-0010(21), and "personal photograph" is defined as "Any analog or digital photograph of a person, or any duplication thereof," O.A.R. 291-131-0010(20). Moreover, "[p]ersonal photographs include any photograph scanned and printed from the internet or other photographs where the identity of the person is unknown to the department or cannot be reasonably ascertained by the department by examining the content of the accompanying material." *Id.* By and through his First Amendment claim, Perez challenges (*inter alia*) the constitutionality of Rule 291-131-0035(2)(j) both facially and as applied to his situation.

Pursuant to O.A.R. 291-131-0025(9), ODOC institutional mailroom staff are required to review publications sent through the mail to inmates as follows:

Central Administration Review of Publications:

(a)    Facility mailroom staff shall stamp approval of all accepted books, magazines and other publications (except newspapers) on the front or inside front cover of the publication, together with the inmate's name, SID number, date accepted, and the authorizing staff's signature.  Books and magazines without the completed stamp on the front or inside the front cover shall be unauthorized and considered contraband.

(b)    Unauthorized attachments, enclosures, merchandise, or materials in publications may be removed and destroyed to allow the publication to be delivered to the intended inmate recipient, if the publication is otherwise in compliance with these rules, and doing so would not drastically alter/destroy the publication.

(c)    If mailroom staff determine a publication contains material that is prohibited under these or other department administrative rules, the violation notice and prohibited material shall be reviewed by a designated Central Administration official, who will either affirm, reverse or otherwise modify the original rejection decision in

writing.  The reviewing official shall not take part in any
subsequent administrative review of the rejected publication under
OAR 291-131-0050.

O.A.R. 291-131-0025(9).  In addition, all incoming inmate mail is subject to inspection or

examination to enforce compliance with applicable ODOC rules.  *See* O.A.R. 291-131-0015(6).

Pursuant to O.A.R. 291-131-0037(6), ODOC institutional mailroom staff are required to dispose

of prohibited mail sent to inmates as follows:

Correspondence and Publications:  When, after opening, mail is rejected for
violation of these or other department rules the following procedures shall be
followed:

(a)   Rejected Mail:

(A)   Non-inmate sender:  The sender and intended inmate
recipient shall be notified of the rejection of mail, including
the reasons, on a Mail Violation Notice (CD 618a) for
correspondence, or a Publication Violation Notice for a
publication.  If the rejection is based upon written or
pictorial content, the notice shall advise that an independent
review of the rejection may be obtained by writing to the
functional unit manager within 30 days of the date of the
notice.  Mail rejected based on written or pictorial content
shall be returned intact to the sender.  The rejected
portion(s) of the mail shall be photocopied and retained
pending any administrative review.  If no administrative
review is requested, the photocopy shall be maintained
according to archive standards.

* * *

(b)   No administrative review shall be available if the rejection is based
on the presence of an unauthorized attachment, substance or
enclosure on or with the mail, or if the rejection is based on any
violation not related to the written or pictorial content.

(c)   Confiscated Mail:

(A)   Non-inmate Sender:  If the mail is confiscated, notice shall

be made to the sender and intended inmate recipient on a Mail Confiscation Notice (CD 618b), unless it includes plans for a discussion or commission of a crime or evidence of a crime. In such cases, no notice shall be given and the mail shall be turned over to the Special Investigations Unit of the department or the Oregon State Police. Confiscated mail not involving evidence of a crime shall be retained intact pending any administrative review. If no administrative review is requested, the mail shall be maintained according to archive standards.

* * *

O.A.R. 291-131-0037(6). Administrative review of mail or publication rejections is available to ODOC inmates:

    (1)    Correspondence and Publications:

        (a)    Non-Inmate Sender:

            (A)    A non-inmate sender who has received a mail violation, publication violation, or confiscation notice for written or pictorial content may obtain an independent review of the rejection of mail by writing to the functional unit manager or designee and requesting an administrative review within 30 days of the date of the notice. The review request shall specify in writing the reason(s) why the rejection should not be sustained and include the rejection notice. The rejected mail if returned to the sender must be submitted with the violation or confiscation notice along with the review request.

            (B)    An intended inmate recipient who has received a mail violation, publication violation or confiscation notice for written or pictorial content may obtain an independent review by writing to the function unit manager or designee and requesting an administrative review within 30 days of the date of the notice. The review request shall specify type of violation (mail, publication, confiscation), date of violation, and name and issue date of any involved publication.

Page 21 - OPINION AND ORDER

\* \* \*

\* \* \*

(3)    Administrative Review Process:

    (a)    The functional unit manager shall appoint an official or employee, other than the employee who originally rejected the correspondence or publication, to conduct the administrative review.

    (b)    The administrative review shall consist of an informal review of the original mail rejection decision and shall include a review of the mail or publication violation or confiscation notice, the request for administrative review, and where necessary, the rejected mail, article(s) or material(s) for compliance with department rules.  No formal hearing shall be conducted.

    (c)    The functional unit manager or designee shall permit the intended inmate recipient an opportunity to review the rejected mail for purposes of administrative review, unless such review may provide the inmate with information of a nature which is deemed to pose a threat or detriment to the security, good order or discipline of the facility or to encourage or instruct in criminal activity.

        (A)    The intended inmate recipient shall specify in writing the reason(s) why the rejection should not be sustained within five days after reviewing the rejected material, or within five days of receiving notice that the inmate was not allowed to review the rejected material for the reasons stated above.

        (B)    If the inmate refuses to review the material, the administrative review will be considered dismissed.

    (d)    The official or employee assigned to review the original mail rejection decision shall deliver a written recommended decision (together with a copy of the mail or publication violation or confiscation notice, the request for administrative review, and where necessary, the rejected mail, article(s) and material(s)) to the functional unit manager or designee for his/her review and approval.

(e)    The functional unit manager or designee shall review the recommended decision and either affirm, reverse or otherwise modify the original mail rejection decision in writing. The administrative review shall be completed within 45 days after receipt of the request for administrative review. A copy of the functional unit manager or designee's decision shall be provided to the party(ies) who requested the administrative review.

O.A.R. 291-131-0050.

## ANALYSIS

**I.    Perez' Motion (#176) for Imposition of Sanctions**

It is Perez' position that defendants' arguments offered in support of their motion for summary judgment and/or in support of their opposition to Perez' motion for summary judgment merit imposition of sanctions pursuant to Federal Civil Procedure Rule 11(c) due to (i) defendants' purportedly improper proffer of their updated Mail Violation Notice and Publication Violation Notice into evidence, (ii) defendants' purportedly improper adoption of the position that the three publication rejections of September 6, 9, and 12, 2013, were effected because the publications contained sexually explicit material, (iii) defendants' purportedly improper partial reliance on the fact that two of the three rejected publications were on the SRCI Publication Violation List at the time the rejections occurred, and (iv) defendants' purportedly improper failure to concede that SRCI's failure to photocopy any portion of any of the three rejected publications prior to returning them to sender constituted a violation of his due process rights. I disagree with Perez' position.

As noted above, Rule 11 provides that, when an attorney signs, files, or advocates a legal memorandum, that attorney certifies that the arguments contained therein are not presented for any improper purpose, that those legal arguments are nonfrivolous, and that factual contentions

contained therein are supported by available evidence. *See* Fed. R. Civ. P. 11(b). Rule 11(c)

requires that a party moving for sanctions under Rule 11 serve the motion on the party against

whom sanctions are sought, and then provide that party 21 days following service of the motion

within which to correct the putatively sanctionable filing before filing the motion with the court.

*See* Fed. R. Civ. P. 11(c)(2). In *Barber v. Miller*, 146 F.3d 707 (9th Cir. 1998), the Ninth Circuit

quoted the Advisory Committee Notes to the amendments that created these procedural

requirements as follows:

> These provisions are intended to provide a type of "safe harbor" against motions
> under Rule 11 in that a party will not be subject to sanctions on the basis of
> another party's motion unless, after receiving the motion, it refused to withdraw
> that position or to acknowledge candidly that it does not currently have evidence
> to support a specified allegation. Under the former rule, parties were sometimes
> reluctant to abandon a questionable contention lest that be viewed as evidence of a
> violation of Rule 11; under the revision, the timely withdrawal of a contention
> will protect a party against a motion for sanctions.

*Barber*, 146 F.3d at 710, *quoting* Fed. R. Civ. P. 11; Adv. Comm. Notes, 1993 Amend.

Moreover, the Ninth Circuit further quoted the Advisory Committee Notes in support of the

conclusion that only formal service of the motion that the moving party intends to file with the

court in the event the putatively sanctionable filing is not withdrawn may trigger the beginning of

the 21-day period:

> To stress the seriousness of a motion for sanctions and to define precisely the
> conduct claimed to violate the rule, the revision provides that the "safe harbor"
> period begins to run only upon service of the motion. In most cases, however,
> counsel should be expected to give informal notice to the other party, whether in
> person or by a telephone call or letter, of a potential violation before proceeding to
> prepare and serve a Rule 11 motion.

*Id.*, *quoting* Fed. R. Civ. P. 11; Adv. Comm. Notes, 1993 Amend. As the *Barber* court

concluded, "[i]t would therefore wrench both the language and purpose of the amendment to the

Page 24 - OPINION AND ORDER

Rule to permit an informal warning to substitute for service of a motion." *Id.* It follows that this court is without authority to impose sanctions pursuant to Rule 11(c) absent the moving party's full compliance with the "safe harbor" provisions of the rule. *See, e.g., Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 788-789 (9th Cir. 2001) (reversible error for a district court to award sanctions pursuant to Rule 11(c) on a party's motion that was not strictly compliant with the procedural requirements of the rule). Because Perez did not serve defendants with his motion at least 21 days prior to filing it with the court – and I note in this connection that Perez was aware of the Rule 11(c)(2) safe harbor provisions at the time he filed his motion, by and through which he expressly requested that those provisions be waived – Perez' sanctions motion must be denied as procedurally noncompliant. *See id.*

Even had Perez complied with the Rule 11(c)(2) safe harbor provisions, he does not in any event identify any conduct by defendants or their counsel that would warrant the imposition of sanctions. As to defendants' purportedly improper proffer of their updated Mail Violation Notice and Publication Violation Notice into evidence, although (as discussed in my Opinion and Order (#142) dated January 5, 2016) at an earlier stage of these proceedings defendants sought improperly to challenge Perez' claims in part based on information contained in the updated forms that was never communicated to Perez at any material time, in connection with the motions now before the court defendants concede without reservation that the notices Perez received are the ones attached as exhibits to his Second Amended Complaint, and offer no argument or suggestion that Perez received notice through any updated version of their forms. Defendants offer no misleading, frivolous, or unwarranted argument in connection with the distinctions between the notices Perez received and the updated notice forms, but rather simply

describe the differences forthrightly.

As to defendants' purportedly improper adoption of the position that the three publication rejections of September 6, 9, and 12, 2013, were effected because the publications contained sexually explicit material, that position is supported by the material evidence (chiefly, the evidence discussed above that the updated forms printed from SRCI's database archive of Publication Violation Notices indicate that, notwithstanding the information contained in the Publication Violation Notices Perez received, the publications were rejected because they contained sexually explicit content, but also the text reading "1a,b,c pp. 12-13, 28-29, 178-183" that appeared on two of the three notices that Perez actually received), and it is neither frivolous nor otherwise improper for defendants to espouse it. As to defendants' purportedly improper partial reliance on the fact that two of the three rejected publications were on the SRCI Publication Violation List at the time the rejections occurred, there is in fact nothing improper about such reliance, and defendants are entitled to adduce any material, nonprejudicial evidence tending to establish that the publications at issue contained sexually explicit material. Finally, as to defendants' purportedly improper failure to concede that SRCI's failure to photocopy any portion of any of the three rejected publications prior to returning them to sender constituted a violation of his due process rights, defendants are entitled to proffer the argument that the process Perez received in connection with the publication rejections was adequate under the circumstances.

For all of the foregoing reasons, Perez' motion (#176) for imposition of sanctions is denied in its entirety.

Page 26 - OPINION AND ORDER

## II.     The Parties' Cross-Motions (#151, #160) for Summary Judgment

As noted above, Perez asserts the defendants' liability under Section 1983 for violating

his free speech rights under the First Amendment and for violating his procedural due process

rights under the Fourteenth Amendment.  Section 1983:

> affords a "civil remedy'" for deprivations of federally protected rights caused by
> persons acting under color of state law without any express requirement of a
> particular state of mind.  Accordingly, in any § 1983 action the initial inquiry must
> focus on whether the two essential elements to a § 1983 action are present:
> (1) whether the conduct complained of was committed by a person acting under
> color of state law; and (2) whether this conduct deprived a person of rights,
> privileges, or immunities secured by the Constitution or laws of the United States.

*Parratt v. Taylor,* 451 U.S. 527, 535 (1981).  It is undisputed for purposes of the parties' cross-

motions for summary judgment that each of the defendants acted at all material times under color

of state law.

### A.     Perez' First Amendment Claim

Perez' First Amendment claim arises out of defendants' conduct in rejecting his incoming

mail on five occasions and in rejecting publications sent to him through the mail on three

occasions, in promulgating and enforcing Oregon Administrative Rule 291-131-0025(11)(b)(D)

(prohibiting inmates from receiving freestanding nude or partially nude images through the mail)

and Oregon Administrative Rule 291-131-0035(2)(j) (prohibiting inmates from receiving

inflammatory material through the mail), and/or in failing to make the ODOC Publication

Violation List readily available to him and to his correspondents.  As a preliminary matter, before

turning to the question whether Perez suffered a deprivation of any right protected under the First

Amendment it is necessary first to determine whether the parties' dispute over the reason for the

three publication rejections may be resolved on the basis of the evidentiary record.

As noted above, it is defendants' position that all three rejections were effected solely because the publications contained sexually explicit material, and not for any different or additional reason. In support of that position, defendants offer evidence (discussed above) tending to establish that on September 6, 9, and 12, 2013, defendant Shupe determined that the three publications contained sexually explicit material and on that basis rejected them, that Shupe sent Perez Publication Violation Notices identifying the rejected publications by title and sender and advising Perez that the publications had been rejected, that all three Publication Violation Notices contained language strongly suggesting that the publications had been rejected because they contained material potentially detrimental to the security, safety, health, good order, or discipline of the facility, that two of the three notices additionally displayed a checked box preceding text reading "1a,b,c pp. 12-13, 28-29, 178-183 Publication Violation," and that at some subsequent time SRCI mailroom staff noticed that the facility's Publication Violation Notice form lacked any mechanism for providing intelligible advice to inmates that publications had been rejected because they contained sexually explicit material, and modified the form both to provide such a mechanism and otherwise to clarify the procedure inmates are required to follow in order to obtain administrative review of publication rejections. Perez takes the contrary position that the publications were rejected on the purported ground that they contained material potentially detrimental to the security, safety, health, good order, or discipline of the facility, and relies for support on the plain language of the three Publication Violation Notices.

I am sympathetic to Perez' position. One of the notices he received contained no suggestion whatsoever that the publication at issue had been rejected for containing sexually explicit material, and the notice text apparently intended to convey that suggestion in connection

with the other two rejections was not intelligible without further information that was not

provided to Perez at any material time. From his pre-litigation perspective, there was simply no

way he could reasonably have been expected to understand that any of the three rejections had

been effected on the basis of sexually explicit content. Nevertheless, while Perez disputes the

inferences defendants ask the court to draw from the evidence upon which they now rely, his own

evidence does not in fact belie defendants' position. To the contrary, Perez' evidence is entirely

consistent with defendants' and tends to support rather than to rebut defendants' version of

events. Because the parties do not dispute the evidence, and because, in light of the undisputed

evidence proffered by defendants, Perez' interpretation of the plain language of the three

Publication Violation Notices is not tenable, I find for purposes of deciding the merits of both of

the two cross-motions for summary judgment now before the court that all three publications

were rejected on the sole basis of sexually explicit content.

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his

status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*

*v. Procunier*, 417 U.S. 817, 822 (1974). However, "[w]hen a prison regulation impinges on

inmates' constitutional rights, the regulation is [nevertheless] valid if it is reasonably related to

legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987) In *Turner*, the United

States Supreme Court set forth four factors that the courts must balance in determining the

constitutionality of prison regulations:

> (1) Whether there is a valid, rational connection between the prison regulation and
> the legitimate governmental interest put forward to justify it;
>
> (2) Whether there are alternative means of exercising the right that remain open to
> prison inmates;

(3) Whether accommodation of the asserted constitutional right will impact guards and other inmates, and on the allocation of prison resources generally; and

(4) Whether there is an absence of ready alternatives versus the existence of obvious, easy alternatives.

*Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008) (internal modifications, quotation marks omitted), *quoting Turner*, 482 U.S. at 89-90, *quoting Block v. Rutherford*, 468 U.S. 576, 586 (1984). The courts of the Ninth Circuit apply the *Turner* factors not merely in determining the constitutionality of prison regulations but also in determining the constitutionality of actions taken pursuant to or to enforce such regulations. *See, e.g.*, *Bahrampour v. Lampert*, 356 F.3d 969, 976 (9th Cir. 2004) (applying the four *Turner* factors to ODOC regulations and concluding on the basis of that analysis that both the regulations and ODOC conduct pursuant to the regulations were constitutional).

For the following reasons, I find that Perez suffered no unconstitutional deprivation of his First Amendment rights in connection with any of the complained-of conduct. In consequence, Perez' motion (#151) for summary judgment is denied to the extent it addresses Perez' First Amendment claim, and defendants' motion (#160) for summary judgment is granted to the extent it addresses Perez' First Amendment claim.

### 1.    Mail Rejections and Publication Rejections

The five mail rejections and three publication rejections at issue here were all effected (as discussed above) on the basis of sexually explicit content. The ODOC regulation governing sexually explicit mail and publications is codified at Oregon Administrative Rule 291-131-0035(1)(a)(A). As the *Bahrampour* court expressly found, all four of the *Turner* factors weigh in favor of the finding that Rule 291-131- 0035(1)(a)(A) passes constitutional muster. *See id.*

Page 30 - OPINION AND ORDER

Specifically, the *Bahrampour* court found that there was a valid, rational connection between

prohibiting sexually explicit materials and the penological interest in preventing rape and other

forms of sexual predation within prison facilities, that the restriction is content-neutral in that it

targets the effects of the prohibited materials rather than effecting a broad ban impacting

innocuous materials, that alternative means for the exercise of inmate free speech rights are

available (as, for example, reading or viewing materials with nude images but no sexually

explicit content, or materials with sexually explicit content that also have "scholarly value, or

general social or literary value" and on that basis may be mailed to inmates pursuant to Rule

291-131- 0035(1)(e), *supra*), that permitting such materials would have a negative impact on

good institutional order, and that there is no ready alternative means of preventing sexually

explicit materials from having such an impact within a prison facility. *See id.* Because the

constitutionality of Rule 291-131- 0035(1)(a)(A) is established, and because there is no dispute

that each of the rejected materials had sexually explicit content, it follows that none of the eight

rejections violated Perez' First Amendment right of free expression. *See id.*

### 2.    Oregon Administrative Rule 291-131-0025(11)(b)(D)

Oregon Administrative Rule 291-131-0025(11)(b)(D) prohibits inmates from receiving

freestanding nude or partially nude images through the mail. It is unclear from the record

whether Rule 291-131-0025(11)(b)(D) was at any material time exercised in connection with

mail sent to Perez at SRCI. On the *arguendo* assumption that Perez has standing to challenge the

constitutionality of Rule 291-131-0025(11)(b)(D), I find that all four of the *Turner* factors

support the finding that the rule passes constitutional muster. First, there is a valid, rational

connection between prohibiting freestanding nude images and the penological interest in

preventing the development of a barter system around such images, which would have a tendency to increase aggressive inmate behavior. *See* Cook Decl., ¶¶ 5-10; *see also Woodroffe v. Oregon*, Case No. 2:12-cv-00124-SI, 2015 U.S. Dist. LEXIS 59158, *28-32 (D. Or. May 6, 2015), *citing Thornburgh v. Abbott*, 490 U.S. 401, 414-415 (1989). Moreover, the restriction is neutral in that it targets the effects of the restricted images rather than broadly prohibiting all nude images. *See Woodroffe*, 2015 U.S. Dist. LEXIS at *29-30, *citing Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999).

Second, it is clear that alternative avenues exist for inmate exercise of the restricted right, including viewing nude images without sexually explicit content that are contained within a publication rather than freestanding. *See* O.A.R. 291-131-0025(11)(b)(D); *see also Woodroffe*, 2015 U.S. Dist. LEXIS at *32-33. Third, permitting inmates to receive freestanding nude images would have a tendency to pose a risk to the health and safety of inmates and prison staff due to the high value of such images to incarcerated prisoners and the ease with which they may be concealed. *See Woodroffe*, 2015 U.S. Dist. LEXIS at *33-34. Fourth, Perez does not identify any ready alternative to the restriction on freestanding nudes that would satisfy the penological interest in preventing the development of a barter system around such images, and because such images are by their nature easy to conceal, it does not appear that any such alternative exists. *See id.* at *34-35.

For the foregoing reasons, Rule 291-131-0025(11)(b)(D) is not facially unconstitutional, and to the extent it may have been applied in connection with mail sent to Perez, its application did not unconstitutionally deprive Perez of any First Amendment right.

### 3.   Oregon Administrative Rule 291-131-0035(2)(j)

Oregon Administrative Rule 291-131-0035(2)(j) prohibits inmates from receiving inflammatory material through the mail. As discussed above, the evidentiary record does not support the conclusion that Rule 291-131-0035(2)(j) was at any material time applied to mail received by Perez. Because the rule was not applied to him, Perez is without standing to challenge its constitutionality. *See, e.g.*, *Resnick v. Adams*, 348 F.3d 763, 772 (9th Cir. 2003), *citing Madsen v. Boise State University*, 976 F.2d 1219, 1220-1221 (9th Cir. 1992).

Even if Perez had standing to challenge the constitutionality of Rule 291-131-0035(2)(j), I would find that it passes constitutional muster for the same reasons articulated in *Forter v. Geer*, 868 F. Supp. 2d 1091, 1101-1103 (D. Or. 2012) (finding Rule 291-131-0035(2)(j) to be facially constitutional).

### 4.   The Publication Violation List

By and through his Second Amended Complaint, Perez characterizes defendants' purported failure to make the ODOC Publication Violation List readily available to him and to his correspondents as a violation of his procedural due process rights. However, by and through his briefing in support of his own motion for summary judgment and in opposition to defendants' cross-motion for summary judgment, Perez seeks to recharacterize that purported failure as a violation of his First Amendment right to free expression. That effort is without merit. First, to the extent Perez seeks to vindicate a purportedly protected First Amendment right of members of the public or of his correspondents to access the PVL, he lacks standing to do so. Second, Perez does not identify any plausible way in which denial of access to the PVL would deprive him of his protected right to free expression. Third, the evidentiary record tends to establish that at no

time prior to this litigation did Perez request a copy of the PVL and not receive it, such that even if he had a protected right to access the list, the record does not support the conclusion that defendants deprived him of that right. Fourth, it is undisputed that prior to ordering the publications rejected on September 6, 9, and 12, 2013 (or directing a correspondent to order them on his behalf), Perez could have inquired of SRCI mailroom staff whether those publications would be permitted under the applicable rules, and did not avail himself of that opportunity. I therefore find that defendants' purported failure to make the PVL more readily available did not deprive Perez of any right protected under the First Amendment.

### B.    Perez' Fourteenth Amendment Claim

Perez' Fourteenth Amendment claim arises out of the administrative process he received in connection with his requests for administrative review of the five mail rejections of August 29, September 5, 10, and 17, and October 2, 2013, and/or the three publication rejections of September 6, 9, and 12, 2013, and/or out of defendants' purported failure to make the ODOC Publication Violation List readily available to him and to his correspondents. To prevail on a procedural due process claim under Section 1983, a plaintiff must establish: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) lack of process." *Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000) (internal modifications omitted), *quoting Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). The "lack of process" element can also be formulated as "denial of adequate procedural protection." *Krainski v. State ex rel. Bd. of Regents*, 616 F.3d 963, 970 (9th Cir. 2010), *citing Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).

Page 34 - OPINION AND ORDER

The question of "what process is due" is more easily asked than answered. As the Supreme Court has frankly acknowledged, "for all its consequence, 'due process' has never been, and perhaps never can be, precisely defined." *Lassiter v. Department of Social Servs.*, 452 U.S. 18, 24, 68 L. Ed. 2d 640, 101 S. Ct. 2153 (1981). Rather, the phrase "expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty." *Id.* As a result, deciphering and applying the Due Process Clause is, at best, "an uncertain enterprise." *Id.*

Precisely what procedures the Due Process Clause requires in any given case is a function of context. After all, "unlike some legal rules," due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 6 L. Ed. 2d 1230, 81 S. Ct. 1743 (1961) (*quoting Joint Anti-Fascist Comm'n v. McGrath*, 341 U.S. 123, 162, 95 L. Ed. 817, 71 S. Ct. 624 (1951) (Frankfurter, J., concurring)) (quotation marks omitted). Rather, **it "is flexible and calls for such procedural protections as the particular situation demands."** *Morrissey* [*v. Brewer*], 408 U.S. [471,] 481 [(1972)]. As this court has observed, "the determination of what procedures satisfy due process [in a given situation] depends upon an analysis of the particular case in accordance with the three-part balancing test outlined in *Mathews v. Eldridge*, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976)." *Orloff v. Cleland*, 708 F.2d 372, 378-79 (9th Cir. 1983) (parallel citations omitted). In *Mathews*, the Supreme Court stated:

> **Identification of the specific dictates of due process generally requires consideration of three distinct factors. First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.**

*Mathews*, 424 U.S. at 335.

*Brewster*, 149 F.3d at 983 (emphasis supplied; modifications original). It is nevertheless well established that "[d]ue process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the [governmental] action and afford them an opportunity to present their objections." *Al Haramain Islamic Found., Inc. v. United States Dep't of the*

*Treasury*, 686 F.3d 965, 985 (9th Cir. 2012), *quoting United Student Aid Funds, Inc. v. Espinosa*,

559 U.S. 260, 272 (U.S. 2010), *quoting Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S.

306, 314 (1950). In the prison context, in connection with withholding delivery of inmate mail,

it is well established that the process inmates are due includes, at a minimum, adequate notice of

the deprivation and an opportunity to present objections thereto through two-level administrative

review (that is, review by a person other than the person who originally rejected the mail or

publication). *See Krug v. Lutz*, 329 F.3d 692, 697-698 (9th Cir. 2003), *citing Sorrels v. McKee*,

290 F.3d 965, 972-973 (9th Cir. 2002), *Prison Legal News v. Cook*, 238 F.3d 1145, 1152 (9th

Cir. 2001).

 For the following reasons, I find that Perez suffered no unconstitutional deprivation of his

Fourteenth Amendment procedural due process rights in connection with the mail rejections of

August 29, September 5, 10, and 17, and October 2, 2013, or in connection with defendants'

purported failure to make the PVL readily available to him and to his correspondents, but that he

did not receive the minimum procedural safeguards to which he was due in connection with the

publication rejections of September 6, 9, and 12, 2013. I further find that defendants Shupe and

Schultz, and no other defendants, had sufficient personal involvement in that deprivation of

Perez' due process rights for liability to attach to them, and that those defendants are not entitled

to qualified immunity. However, because neither Perez nor the defendants have offered evidence

or argument regarding Perez' burden to prove that he suffered damages in consequence of that

deprivation of his rights, I decline to issue any award of damages in Perez' favor at this stage of

these proceedings, and instead defer the question of damages until such time as the parties have

had the opportunity to offer proof as to whether Perez is entitled to award of compensatory

damages. In consequence, Perez' motion (#151) for summary judgment is granted as to Perez'

Fourteenth Amendment claim to the extent that claim addresses the liability (only) of Shupe and

Schultz for the deprivation of Perez' due process rights in connection with the three complained-

of publication rejections and is otherwise denied as to the Fourteenth Amendment claim,

defendants' motion (#160) for summary judgment is denied as to Perez' Fourteenth Amendment

claim to the extent that claim is alleged against Shupe and Schultz and premised on those

defendants' deprivation of Perez' due process rights in connection with the three complained-of

publication rejections, and is otherwise granted as to the Fourteenth Amendment claim.

### 1. Administrative Process in Connection with the Mail Rejections of August 29, September 5, 10, and 17, and October 2, 2013

Defendants do not dispute that Perez had a liberty interest in receiving mail. Indeed, that

liberty interest is well established. *See, e.g., Procunier v. Martinez*, 416 U.S. 396, 417 (1974).

Defendants argue only that Perez received all process to which he was due in connection with the

five mail rejections of August 29, September 5, 10, and 17, and October 2, 2013.

It is undisputed that on the occasion of each of the five complained-of mail rejections,

defendant Evans rejected the mail on the grounds that it contained "[s]exually explicit" content

and that "[s]exually explicit material is prohibited." *See* Second Amended Complaint, Exh. 1. It

is further undisputed that, although Evans' Mail Violation Notices were unclear regarding the

procedure inmates are required to follow in order to obtain administrative review of mail

rejections and although the notices specifically indicated that administrative review could be

obtained "by writing to the Functional Unit Manager or designee at the above address," without

supplying an address for the Functional Unit Manager or for any designee thereof, Perez

successfully requested and received review of each rejection from defendant Clements, who was

Page 37 - OPINION AND ORDER

not the person (Evans) who initially rejected Perez' mail. *See id.*; *see also id.*, Exhs. 2-3. It is

further undisputed that Perez was afforded an opportunity to provide a written objection to each

rejection, and that he availed himself of that opportunity as well. *See id.*, Exh. 3. It is therefore

undisputed that Perez received all process to which he was due in connection with each of the

five complained-of mail rejections: notice of the rejection, including the reasons underlying the

rejection; an opportunity to present an objection to the reasons underlying the rejection; and two-

level administrative review. *See Krug*, 329 F.3d at 697-698. It follows that Perez suffered no

deprivation of his due process rights in connection with any of the five mail rejections.

### 2.    Administrative Process in Connection with the Publication Rejections of September 6, 9, and 12, 2013

Again, defendants do not dispute that Perez had a liberty interest in receiving publications

through the mail, including publications with sexually explicit content. Again, the liberty interest

at issue is well established. *See, e.g., Frost v. Symington*, 197 F.3d 348, 353 (9th Cir. 1999). It is

defendants' position that Perez received all process to which he was due in connection with the

three publication rejections of September 6, 9, and 12, 2013.

It is undisputed that on the occasion of each of the three complained-of publication

violations, defendant Shupe rejected the publications and sent Perez a Publication Violation

Notice so advising him. *See* Second Amended Complaint, Exh. 4 at 1-3. Although Perez has

espoused a contrary position, I have found (as discussed above) for purposes of both dispositive

motions now before the court that defendants have proffered evidence sufficient to establish that

Shupe rejected each of the three publications on the sole ground of its sexually explicit content.

As discussed above, the fact that each publication was rejected on the sole ground of

sexually explicit content could not be ascertained from any of the three notices Shupe sent to

Page 38 - OPINION AND ORDER

Perez. *See id.* Specifically, one of the three notices contained no indication whatsoever that

sexually explicit content was at issue, the other two notices contained text which was intended so

to indicate but which was in fact unintelligible without further information that was not at any

material time made available to Perez, and all three notices contained language strongly

suggesting a different ground for the rejection. *See id.* Because the Publication Violation

Notices did not intelligibly state the reason for the rejections, they were not adequate to put Perez

on notice of that reason, and had no tendency to provide Perez an opportunity to frame a cogent

objection to any of the three rejections.

It is further undisputed that Perez requested administrative review of each of the three

publication rejections. *See id.*, Exh. 4 at 4, 6, 8. It is likewise undisputed that, in response to

Perez' requests for administrative review, defendant Schultz ultimately told Perez that because

SRCI mailroom staff had "accidentally" failed to keep copies on file of any photocopied portions

of any of the three rejected publications, he would not be given any administrative review in

connection with any of the three rejections. *Id.* Schultz further advised Perez that administrative

review could potentially be available in connection with future publication rejections – as, for

example, if he were to order the same publications a second time, at his own expense – but made

no effort to provide two-level review in connection with any of the three publication rejections at

issue in this litigation. *See id.*

Parenthetically, I note that SRCI mailroom staff's failure to retain photocopied portions of

any of the rejected publications did not constitute a significant barrier to providing Perez with the

two-level administrative review to which he was entitled. Had Perez been informed at any

material time that the publications had been rejected because of their sexually explicit content,

Page 39 - OPINION AND ORDER

Perez would then have had an opportunity to argue either that the publications lacked sexually explicit content, that the publications had "scholarly value, or general social or literary value" and on that basis could be mailed to him pursuant to Rule 291-131- 0035(1)(e), and/or that the prohibition of materials with sexually explicit content was unenforceable.  A person other than Shupe, even in the absence of photocopied portions of the publications, could then have made a determination in connection with each publication – perhaps on the basis of publishers' and/or booksellers' promotional language, perhaps on the basis of customer reviews on publishers' or booksellers' websites, perhaps on the basis of the books' titles alone – whether or not each rejection was appropriate under the applicable rules notwithstanding Perez' stated objections. This did not occur, and instead Perez was simply denied administrative review entirely.

As a further parenthetical matter, I note that the fact that two of the three rejected publications had been previously rejected and appeared on the Publication Violation List at the time the complained-of rejections occurred does not establish that Perez suffered no deprivation of his procedural due process rights in connection with the rejections of those two publications. Notwithstanding the previous rejection of two of the publications, Perez was entitled to adequate notice of the reasons for the rejections, and an opportunity to object to the rejections in connection with two-level administrative review.  He never received such notice, and never received a meaningful opportunity to frame a cogent objection.

Because Perez did not receive either the meaningful notice or the opportunity to present objections in connection with two-level administrative review to which he was due under applicable Fourteenth Amendment jurisprudence, he suffered an actionable deprivation of his procedural due process rights.  For liability to attach to an individual defendant under Section

1983 in connection with such a deprivation of rights, the defendant must either have been

personally involved in causing the deprivation or have had a sufficient causal connection with the

deprivation to warrant imposition of liability, as for example by directing others to effect the

deprivation, setting in motion the actions of others which culminated in the deprivation, or

knowingly declining to prevent others from causing the deprivation. *See, e.g.*, *Starr v. Baca*, 652

F.3d 1202, 1207-1208 (9th Cir. 2011). The evidence of record establishes the personal

involvement of defendants Shupe and Schultz in effecting the deprivation of Perez' due process

rights in connection with the complained-of publication rejections of September 6, 9, and 12,

2013, but does not establish the personal involvement of any other defendant. Perez offers no

allegation, argument, or evidence that defendants Evans, Clements, or Raths had any

involvement in the deprivation of his due process rights in connection with the complained-of

publication rejections, and his only evidence in support of his position that defendants Peters,

Nooth, or Geer could be liable as supervisors is SRCI mailroom staff's failure to retain

photocopies of any portions of any of the three rejected publications, which Perez characterizes

as evidence of a *de facto* policy of failing to comply with applicable regulations regarding

publication rejections. In response to this characterization, defendants take the position that

applicable regulations required them only to retain photocopies of portions of rejected

publications not already on the PVL at the time the rejection occurred, and argue that because

two of the three publications were on the PVL in September 2013, the failure to retain

photocopies occurred on only one occasion rather than on three occasions. Defendants further

offer a former SRCI lead mailroom worker's declaration testimony that the failure to keep

photocopies of any portion of the three rejected publications was "not pursuant to any written or

Page 41 - OPINION AND ORDER

unwritten custom, and was human error." Cook Decl., ¶ 55. Even interpreting the evidence in

the light most favorable to Perez and resolving evidentiary conflicts in his favor, Perez' evidence

is insufficient to create a material question of fact as to whether Peters, Nooth, or Greer had

sufficient causal connection to the complained-of deprivation for supervisory liability to attach to

them. In consequence, defendants Evans, Clements, Raths, Peters, Nooth, and Greer may not be

found liable in connection with the deprivation of Perez' procedural due process rights, but Shupe

and Schultz are subject to liability, including liability for money damages, unless they are entitled

to qualified immunity. It is defendants' position that they are so entitled.

The United States Supreme Court has described the qualified immunity doctrine as

follows:

> The doctrine of qualified immunity protects government officials from liability for
> civil damages insofar as their conduct does not violate clearly established
> statutory or constitutional rights of which a reasonable person would have known.
> Qualified immunity balances two important interests—the need to hold public
> officials accountable when they exercise power irresponsibly and the need to
> shield officials from harassment, distraction, and liability when they perform their
> duties reasonably. The protection of qualified immunity applies regardless of
> whether the government official's error is a mistake of law, a mistake of fact, or a
> mistake based on mixed questions of law and fact.

*Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009) (citations, internal quotation

marks omitted).

The qualified immunity analysis consists of two steps. One step analyzes whether a

constitutional right was violated, while the other examines whether the right was clearly

established. Following *Pearson*, the courts are permitted to perform these steps in whichever

order is more appropriate under the circumstances of the case, considering the development of

the facts and legal issues in the record before the court and the stage of proceedings at which the

qualified immunity issue is examined. *See Pearson*, 129 S. Ct. at 818.

Here, the foregoing discussion has established that the conduct of Shupe and Schultz violated Perez' constitutional right of procedural due process, such that the only remaining inquiry in connection with defendants' assertion of qualified immunity is whether it was clearly established that those defendants' complained-of conduct was unconstitutional at the time it occurred. The jurisprudence discussed above indicates that an inmate's right to adequate notice of rejected mail and a right to frame objections to the rejection in connection with two-level administrative review was well established prior to 2013. *See Krug* 329 F.3d at 697-698. There can be no argument that these defendants could reasonably have been unaware that failure intelligibly to advise Perez of the reasons for the publication rejections did not constitute notice of the rejections adequate to permit him to frame a cogent objection, or that suggesting that two-level administrative review in connection with possible future publication rejections did not constitute provision of two-level administrative review in connection with the publication rejections actually at issue. It follows that Shupe and Schultz are not entitled to qualified immunity in connection with their deprivation of Perez' due process rights.

Perez prays for monetary damages to compensate him for emotional distress he alleges to have suffered in consequence of the deprivation of his due process rights in connection with the three publication rejections of September 6, 9, and 12, 2013. However, neither Perez nor the defendants have offered evidence as to whether or not he suffered such damages. It is well established that "although mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983," it is inappropriate as a matter of law to "award[] compensatory damages without proof that such injury actually was caused" by the deprivation of

a plaintiff's due process rights. *Carey v. Piphus*, 435 U.S. 247, 264 (1978). Although it can be appropriate to award nominal damages not to exceed $1 in favor of a plaintiff who has successfully established a defendant's liability without offering proof of damages, *see id.* at 267, in light of the latitude in meeting procedural requirements to which Perez is entitled as a *pro se* incarcerated litigant, *see Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998), and in light of the fact that defendants, also, did not offer evidence or argument as to Perez' burden to prove consequential damages, I decline to grant either of the parties' cross-motions as to the question of Perez' entitlement to award of emotional distress damage. It shall be for the parties to determine whether it is most appropriate to seek resolution of the question of Perez' entitlement to damages through trial limited to the question of damages, through submission of declaration testimony or other written evidence, through negotiated settlement, or by alternative means.

### 3.    The Publication Violation List

By and through his Second Amended Complaint, Perez characterizes defendants' purported failure to make the ODOC Publication Violation List readily available to him and to his correspondents as a violation of his procedural due process rights. As discussed above in connection with Perez' efforts to recharacterize that purported failure as a First Amendment violation, to the extent Perez seeks to vindicate a purportedly protected due process right of members of the public or of his correspondents to access the PVL, he lacks standing to do so.

To the extent Perez may not have abandoned his Fourteenth Amendment claim alleged on his own behalf and premised on the failure to make the PVL more readily available, he offers no allegation or argument suggesting grounds for concluding that he had any liberty or proerty interest in access to the list. Moreover, also as discussed above, the evidentiary record tends to

establish that at no time prior to this litigation did Perez request a copy of the PVL and not

receive it, such that even if he had a protected right to access the list, the record does not support

the conclusion that defendants deprived him of that right, and it is undisputed that prior to

ordering the publications rejected on September 6, 9, and 12, 2013 (or directing a correspondent

to order them on his behalf), Perez could have inquired of SRCI mailroom staff whether those

publications would be permitted under the applicable rules, and did not avail himself of that

opportunity. I therefore find that defendants' purported failure to make the PVL more readily

available did not deprive Perez of any right protected under the Fourteenth Amendment.

**CONCLUSION**

For the reasons set forth above, Perez' motion (#151) for summary judgment is granted as

to his Fourteenth Amendment claim to the extent that claim addresses the liability (only) of

Shupe and Schultz for the deprivation of Perez' due process rights in connection with the three

complained-of publication rejections and is otherwise denied, defendants' motion (#160) for

summary judgment is denied as to Perez' Fourteenth Amendment claim to the extent that claim is

alleged against defendants Shupe and Schultz and premised on the deprivation of his procedural

due process rights in connection with the three complained-of publication rejections, and is

otherwise granted, and Perez' motion (#176) for imposition of sanctions is denied.


DATED this 7th day of February, 2017.

Honorable Paul Papak
United States District Judge